# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | |
|---|---|
| Lemberg Law LLC,<br>    Plaintiff,<br>v.<br><br>Tammy Hussin, Law Office of Tammy Hussin P.C. d/b/a Hussin Law<br><br>    Defendants. | Civil Action No.: 3:15-CV-00737-MPS<br><br><br><br><br><br>December 17, 2015 |

## DECLARATION OF SERGEI LEMBERG, ESQ.

Pursuant to 28 U.S.C. § 1746, I, Sergei Lemberg, hereby declare as follows:

## BACKGROUND

  1.  I am the principal of Lemberg Law LLC., the Plaintiff in this action, and submit this Declaration in support of Plaintiff's Rule 12(f) Motion to Strike the Amended Answer, Affirmative Defenses, and Counterclaim to Plaintiff's Complaint (the "Answer"). (Doc. No. 32).

  2.  I hold a law degree from the University of Pennsylvania Law School and an undergraduate degree from Brandeis University.

  3.  Prior to opening my own firm, I held positions in the New York offices of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C. and practiced law at Andrews Kurth LLP and Day Pitney LLP. I have personal knowledge as to all matters set forth in this Declaration and could

{W2624089}

testify to the same if called to do so.

4. I am, and have been since admission, a member in good standing of the bars of Massachusetts, Connecticut, Georgia, New York and Pennsylvania.

5. I am also admitted to practice, and have appeared before, before the First, Second, Third, Fifth, Seventh, Ninth and Eleventh Circuit Courts of Appeal.

6. In addition to State Bar admissions, I am also admitted to practice, and have remained in good standing since admission, before the following Federal Courts: the District of Massachusetts, Eastern and Western Districts of Arkansas; the District of Connecticut; the Northern and Middle Districts of Georgia; the Northern, Central and Southern Districts of Illinois; the District of Maryland; the Eastern and Western Districts of Michigan; the Eastern District of Missouri; the District of Nebraska; the Northern, Southern, Eastern and Western Districts of New York; the Northern District of Ohio; the Northern, Eastern and Western Districts of Oklahoma; and the Western District of Texas.

7. In 14 years of practice, have never been sanctioned, reprimanded or disciplined by any court. disciplinary authority or judicial body.

8. I am a former Chair of the Consumer Law Section of the Connecticut Bar Association.

## LEMBERG LAW LLC & TAMMY HUSSIN

9. My firm's practice focuses on representing consumers across the country in consumer law cases brought under Federal Law.

10. Beginning in the Spring of 2011, Ms. Hussin worked for Lemberg Law as a contract of-counsel lawyer, handling the firm's cases in California federal courts. During the entire time Ms. Hussin worked for the firm, she had remote access to our computer system and a Lemberg Law telephone at her home office in Carlsbad, California.

11. She had occasion to visit our Stamford office only once, however, for several hours on Friday afternoon before our 2012 Christmas Party.

12. The relationship worked well for a time, but it deteriorated toward the end of 2013.

13. Even though I was unhappy with Ms. Hussin's work, I did not fire her immediately. She had recently gone through personal difficulties, and I felt a smoother transition would be more beneficial for her and for the firm. I also felt that a smooth transition and a clean slate would benefit her eventual successor for California work. We discussed the option of Ms. Hussin starting her own firm.

14. In the beginning of 2014, Ms. Hussin indicated that she wanted to start her own law firm. Over the next few weeks she and I negotiated an agreement via e-mail as a result of which she was to inherit all California filed and unfiled cases in exchange for payment of 40% of fees to my firm. Ms. Hussin admits this in Paragraph 33 of her Answer. Most of the cases that Ms. Hussin was thus inheriting had been originated and worked up by her and other staff members while she was paid by my firm. For the filed cases, my firm had borne the expenses of litigation.

15. In or about February 2014, Hussin finally established Hussin Law, but set up logistics proved more daunting and time consuming for her than she had anticipated. She had to manage a significant caseload without an established system.

16. Therefore, she asked me, and I agreed, that she would continue prosecuting all cases under the Lemberg Law name until her systems were up and running. Such cases were to be handled pursuant to Lemberg Law's agreement with the clients; Ms. Hussin continued to use my law firm's support staff; she continued to use her @lemberglaw.com email address; she

continued to use our telephone systems; she continued work on one class action case where she served as local counsel (Horton v. Cavalry Portfolio SDCA). She continued to use our Pacer and Westlaw accounts. She continued, in other words, to prosecute these cases as of-Counsel to Lemberg Law.

17. There was one specific limitation on which I insisted and to which she committed: she agreed to limit her to access in our ProLaw computer file system to only California cases while she remained on our system. There was no reason to continue allowing Ms. Hussin to have access to our system and internal resources beyond the cases she was handling, and I trusted that she would abide by these limits.

18. And so, in the Winter and Spring of 2014, Ms. Hussin continued to be part of Lemberg Law for the Lemberg Law clients she inherited. I and my staff were involved in the transfer of the digital files to her, a process which caused her so much consternation that I suggested at one point that she ought to print all documents out, travel to Staples to buy folders, and maintain her files in the old fashioned way as I had done for years after starting my firm.

19. On May 29, 2014, I discovered that Ms. Hussin was a 'heavy email user' – i.e. the size of her Lemberg Law Outlook mailbox had become uncommonly large and continued to increase. I instantly logged into her email to discover that she had, in fact, breached her server access.

20. Among other things, while she had access to our system, Ms. Hussin accessed cases in states other than California; Ms. Hussin misappropriated (by e-mailing to herself) a number of proprietary, firm-owned documents, including but not limited to manuals and memoranda on handling consumer law cases under the Telephone Consumers Protection Act and the Electronic Funds Transfer Act, templates of discovery requests and responses, in individual and class action cases (in California as well as in other States, such as Georgia and Illinois);

firm-developed credit report dispute letters; firm-developed, customized templates for court filing documents in the federal courts, the firm's proprietary list of process servers throughout the entire country, proprietary detailed instructions for Telephone Consumers Protection Act clients, the firm's client engagement letters, and client lists. I immediately confronted Ms. Hussin with the evidence and terminated her access to the Lemberg Law computer system the same day – May 29, 2014.

## ESCROW ISSUES

21. After the access breach was discovered, I confronted Ms. Hussin. After multiple e-mail exchanges, her position emerged: she had discovered evidence of 'wrongdoing' in rummaging through our computer files, which constituted a 'material breach' of my firm's agreement with her, which excused her obligation to pay the money that she had agreed to pay.

22. After engaging in months of efforts to resolve the dispute amicably, including at one point an offer to mediate in San Diego, where she lives, I retained Attorney Nolin and filed suit against Ms. Hussin and her law firm.

## DEPLETION OF THE ESCROW

23. Ms. Hussin had indicated to me that she would be escrowing money she owed to my firm in a separate account.

24. Immediately after suit was filed, Mr. Nolin began demanding these escrow records from Ms. Hussin.

25. Ms. Hussin soon produced a bank statement and spreadsheet showing that she purported to escrow some of the settlement funds. I attach a copy of the bank statement entitled 'LEMBERG ESCROW XXXXX3691.' Exhibit A

26. Attorney Nolin has repeatedly pressed Ms. Hussin to produce all bank records and an accounting of the escrowed funds that she is required to maintain under California rules, as

summarized in California State Bar Formal Opinion 2008-175.[1] Ms. Hussin has thus far resisted the requests.

27. Recently, Ms. Hussin advised Mr. Nolin that she no longer has money in the escrow account, having transferred the monies to a brokerage account for her own purposes.

## DEFENDANTS' ANSWER

28. As we continued to insist that escrow documents be produced, Ms. Hussin filed her Answer, which she has now amended once.

29. The documents are laced with irrelevant, inflammatory invective. I ask that the Court strike substantial portions of it from the docket.

30. Slander such as "Lemberg is a liar, a thief, and conducts his "consumer protection" practice with little regard for those he portends to protect" should not be allowed to remain on the docket of this case.

31. The irrelevant allegations of impropriety raised by Defendants' have caused me severe prejudice.

32. The Amended Answer and Counterclaim has been circulated to the consumer law bar nationwide and in Connecticut, causing a number of inquiries from colleagues.

---

[1] In *Johnstone v. State Bar* (1966) 64 Cal.2d 153, 155-156 [49 Cal.Rptr. 97], the Supreme Court held:
> "When an attorney receives money on behalf of a third party who is not his client, he nevertheless is a fiduciary as to such third party. Thus the funds in his possession are impressed with a trust, and his conversion of such funds is a breach of the trust."

Applying this principle, the Supreme Court disciplined a lawyer for failing to honor the lien of a workers' compensation carrier after settling a personal injury action, concluding that the attorney was guilty of commingling funds as well as dishonesty and moral turpitude in violation of Business and Professions Code section 6106. (*Id.* at p. 156.) It is also settled that an attorney who settles a personal injury action and holds funds in her or his CTA is under a fiduciary duty to the medical lienholders. (*See, e.g., In the Matter of Nunez* (Review Dept. 1992) 2 Cal. State Bar Ct. Rptr. 196, 200.) Although rule 4-100(B)(4) speaks only in terms of the duty to promptly pay or deliver funds held in trust to the client, the Supreme Court and State Bar Court have both repeatedly confirmed that the rule applies to third parties, such as lienholders, as well as to clients. (*See, Guzzetta v. State Bar* (1987) 43 Cal.3d 962, 979 [239 Cal.Rptr. 675] [Rule 8-101, the predecessor to rule 4-100, requiring an attorney to maintain complete records, to render appropriate accounts, and to promptly pay or deliver funds held in trust to a client, applies to third parties as well as clients]; *In the Matter of Mapps* (Review Dept. 1990) 1 Cal. State Bar Ct. Rptr. 1, 10 [even though rule 8-101 refers only to meeting obligations to pay clients and not to meeting obligations to pay third parties, the attorney nonetheless violated the rule by failing to honor a medical lien]; *Baca v. State Bar* (1990) 52 Cal.3d 294, 299 (fn. 3) [276 Cal.Rptr. 169] [because attorney liens are payable out of the client's recovery, an attorney who does not honor valid liens payable to another attorney is not only guilty of conversion and acts of moral turpitude, but also violates rule 4-100]; *In the Matter of Respondent F* (Review Dept. 1992) 2 Cal. State Bar Ct. Rptr. 17, 19 ["Where an attorney assumes the responsibility to disburse funds as agreed by the parties in an action, the attorney owes an obligation to the party who is not the attorney's client to ensure compliance with the terms of the agreement."]; and *In the Matter of Respondent P* (Review Dept. 1993) 2 Cal. State Bar Ct. Rptr. 622, 633 [Former rule 8-101(B)(4) applied not only to the attorney's obligations to clients, but also to the attorney's obligations to pay third parties out of funds held in trust, including the obligation to pay medical lienholders].)

{W2624089}

33.     The Amended Answer and Counterclaim has been circulated to the defense bar nationwide and in Connecticut. I have been forced to issue Cease and Desist letters seeking to halt the republication of this defamatory and slanderous filing.

34.     In addition to professional embarrassment, I have received inquiries from trade newspapers concerning the allegations.

35.     Having spent my escrow money and seeking some perceived leverage, Ms. Hussin has sent her pleading to Bar Counsel in Connecticut and the Connecticut Attorney General.

36.     Since I believe most of the inflammatory material will be struck as irrelevant and inappropriate in this case, I nonetheless feel it appropriate to address several specific concerns Ms. Hussin raises.

### **PRIVACYSTAR**

37.     Privacystar is an Arkansas-based company that created a call-blocking application called PrivacyStar or MetroBlockIt that allows users to block unwanted calls and transmit complaints to the FTC.

38.     For a time from Fall 2013 until early 2014, my law firm had an advertising agreement with the company. Pursuant to the agreement, my firm provided certain intellectual property to PrivacyStar. PrivacyStar, in turn, enabled its users to seek a legal consultation from my firm and to enable its users to pass their information to us at the user's request.

39.     The arrangement was created with the help of, and was vetted by, former Connecticut Chief Disciplinary Counsel Attorney Mark Dubois who has advised me on ethics matters for years.

{W2624089}

40. PrivacyStar enabled its users to request a legal consultation by showing them a screen shown in Figure 1 or a substantially similar message.

41. Further, to ensure that PrivacyStar at all times fully informed its users that they were contacting an attorney and obtained the necessary consent, PrivacyStar agreed to indemnify my law firm for any claims by users whose information was passed on without their consent:

> PrivacyStar warrants to Lemberg that PrivacyStar has, or will have, the consent required by Federal and State law from the PrivacyStar user necessary to provide the user's data record to Lemberg. PrivacyStar agrees to indemnify and hold Lemberg harmless and defend Lemberg from and against any and all liabilities, claims, reasonable expenses, losses or damages, including reasonable attorney's fees, incurred by Lemberg in connection with any claims brought by a PrivacyStar subscriber alleging that PrivacyStar failed to obtain such user's consent to provide the data records with respect to such user to Lemberg. (PrivacyStar Agreement, Par. 5(b)

42. When Lemberg Law received information about a PrivacyStar user who requested legal help, we followed strict procedures, documented the firm's Intake Manual, for contacting these potential clients.

43. The firm's Intake Manual specifically provided the following script:

```
PRIVACY STAR CALLER
"HI, THIS IS _____, FROM LEMBERG LAW.
YOU SUBMITTED A COMPLAINT TO PRIVACY STAR ABOUT _____
CALLING YOU.  WE CAN HELP YOU STOP THESE CALLS.
PLEASE CALL ME BACK AT 855-301-2100 AT EXTENSION _____. THANK YOU."
```

Figure 1

44. I have examined the files and email correspondence of each client of the former who Ms. Hussin now says was hoodwinked into being represented by my law firm. None of the files and none of the emails reveal any such confusion.

**JOHN "DOE" WHO DID NOT KNOW HE WAS REPRESENTED BY THE FIRM**

45. Ms. Hussin claims that a client named John "Doe", whose actual name is John Bui, did not know he was being represented by my firm and was confused and mistrustful about the process throughout. These allegations are not only irrelevant, but they cause me and my firm

{W2624089}

prejudice.

46. Email correspondence attached as <u>Exhibit B</u> (redacted for privilege) shows that after Mr. Bui engaged my law firm, Ms. Hussin, as Of-Counsel to Lemberg Law, handled his case, communicated with him, advised him, and gathered his documents. Mr. Bui even invited Ms. Hussin – then still a Lemberg lawyer – to his house for a meeting. Ms. Hussin eventually settled his case for a substantial sum. The emails reveal no actual confusion whatsoever.

### DIXON PHONE RECORDS FEE

47. Defendants claim throughout the Answer that my firm improperly charged clients a phantom $595 "PrivacyStar Cost" that was not actually incurred (Answer, First Affirmative Defense ¶ 1(f))). This is a baseless, ludicrous claim designed to mar my and my firm's reputation.

48. First, any $595 PrivacyStar Cost was not a referral or phantom "fee." Instead, from time to time my firm requested from PrivacyStar complete telephone records for clients who had engaged us, rather than records of a single call originally received.

49. In the beginning, PrivacyStar charged my firm $595 for each such record, although it would waive such fees as our collaboration expanded. While the fee appeared high, it is no higher, and perhaps lower, than fees charged by some telephone companies for clients' telephone records.

50. Hussin claims that our client Brittany Dixon was charged that fee because the Privacy Star records were obtained. (Answer, Counterclaim, Factual Background ¶¶ 138-145).

51. In fact and in truth, as best as I can tell from email and accounting records:

- On November 12, 2013, Ms. Hussin herself requested that paralegals obtain from PrivacyStar Ms. Dixon's telephone records after she approved it as a viable case (this was after two paralegals in my office had already spoken with Dixon about the facts of her case) <u>Exhibit C</u>

- The records were ordered at Ms. Hussin's specific direction

- According to our bookkeeping records, PrivacyStar was paid $595 for Ms. Dixon's records for her file as part of an invoice.

52. Defendants' allegations that the $595 cost incurred by my firm on Ms. Dixon's behalf, or for other unidentified clients, were nonexistent, inflated or unauthorized, are wrong, unsupported and leveled for the sole purpose of maligning Plaintiff and prejudicing Plaintiff's case.

53. After ending my relationship with PrivacyStar, in collaboration with a partner and much to PrivacyStar's consternation, I developed a competing call blocking app now called the Legal Call Blocker (f/k/a "Block Calls Get Cash"). I had this app vetted and approved The App itself was vetted in CONNECTICUT BAR ADVISORY OPINION #14-03932.

## ADMINISTRATIVE FEES

54. Ms. Hussin complains that the firm charged unauthorized or illegal administrative fees to clients and seeks to somehow recover these.

55. The assertion is nonsense designed to cause expense and prejudice. At all relevant times, Ms. Hussin was the firm's California lawyer. It was thus her job to advise me and firm whether the fees, which allocate a fraction of litigation overhead in some cases to clients, were permitted or not. They appear to be authorized in California.

> …Absent such specification, a California lawyer may bill a client for the direct cost of in-house services necessary for the lawyer's representation of a client. The intent of such charges, however, is not that the lawyer make an additional profit, but rather solely that the lawyer be compensated—at actual cost—for expenses necessarily incurred in the client's representation. In addition, a lawyer may bill a client for a reasonable allocation of overhead expenses directly associated with providing the in-house service. https://www.sdcba.org/index.cfm?pg=EthicsOpinion20133

56. Ms. Hussin herself reviewed and approved a Legal Services Agreement containing such a fee without saying one word about their propriety. Exhibit D.

{W2624089}

57. She should therefore be estopped from making any argument to recover a portion of these fees for herself or anyone else.

### FAILED TO INSTRUCT STAFF TO DIRECT INQUIRIES TO MS. HUSSIN

58. Ms. Hussin claims that I failed to instruct staff to direct inquiries to her. This claim is false and malicious and designed to impugn my professional reputation. Ms. Hussin knows full well that for many months after I terminated her computer access, I forwarded to her each and every email she received to the my firm's Lemberg Law e-mail, at the cost of significant time and expenditure to myself.

59. In addition, while her computer access was terminated, Ms. Hussin continued to maintain one of the firm's telephones in her office. She continued to have an extension on our menu and to be able to receive phone calls and messages on that telephone. In fact, despite multiple requests she failed to return the telephone to us. She has kept it to this day.

### ERIC OHANIAN

60. In paragraphs 176-179 Defendants reference a Eric "Doe" ("Eric") and state that Eric did not retain my firm for legal services and a complaint was improperly filed on his behalf without this consent and without consultation with the client.

61. Ms. Hussin is also plain wrong. In fact, Eric first contacted my firm in December, 2013. He first spoke with a paralegal in my office concerning possible legal action against a debt collector and provided us documents to support his claim. In December, 2013, he also communicated with Ms. Hussin regarding his potential claim. On March 7, 2014, Eric executed a legal services agreement with my firm. Thereafter, he again provided additional information concerning his claim; spoke with additional paralegals and attorneys at my firm.

62. Indeed, on March 13, 2014, Eric was specifically told that I would be the attorney reviewing his file for suit and Eric thanked us for moving forward with the case. <u>Exhibit E</u> Defendants' suggestion that Eric did not know he was represented by my firm or myself is flatly

{W2624089}

untrue. After the case was filed, Hussin presumably told Eric to discharge the Firm as she wanted to proceed with the case herself.

## E-SIGN PROCESS

63.     In early 2012, my firm retained Attorney Mark Dubois, who had then just retired from the position of Chief Disciplinary Counsel, to review all of the firm's operations and agreements and ensure ethical compliance.

64.     As Hussin is well-aware, the firm's process for engaging new clients was reviewed by Mr. Dubois. Pursuant to the process, pursuant to the E-sign Act, potential clients would execute a Request for Legal Services once found on this website: http://lemberglaw.com/welcome-2. Once the potential client requested that the firm represent him or her, the reviewing attorney reviews and accepts the request, forming a signed, written agreement required by the bars of most states in contingency cases. Hussin was provided an opportunity to comment on this arrangement. She did not. Exhibit F She represented many hundred of clients who executed and signed retainers online, all without ever raising any claims of invalidity or impropriety.

I declare under penalty of perjury that the foregoing is true and accurate to the best of my knowledge.

Executed on December 17, 2015

                                                */s/ Sergei Lemberg*
                                               Sergei Lemberg

## **CERTIFICATION**

I hereby certify that on December 17, 2015, a copy of the foregoing Affidavit was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.

    By:  /S/ Ryan W. Scully
Ryan W. Scully

{W2624089}