# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| Lemberg Law LLC,<br><br>              Plaintiff,<br><br>    v.<br><br>Tammy Hussin, Law Office of Tammy Hussin<br>P.C. d/b/a Hussin Law<br><br>              Defendants. | Civil Action No.: 3:15-CV-00737-MPS<br><br><br>January 29, 2016 |

## PLAINTIFF'S MEMORANDUM OF LAW IN
## SUPPORT OF ITS RENEWED MOTION TO STRIKE AND MOTION DISMISS
## PORTIONS OF DEFENDANTS' SECOND AMENDED ANSWER,
## AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

Plaintiff, Lemberg Law, LLC ("Lemberg"), through undersigned counsel, files this

Memorandum of Law in Support of its Renewed Motion to Strike and Motion to Dismiss

Defendants' Affirmative Defenses and Counterclaims.   As stated in Plaintiff's Original Motions

(Docs. 42 and 43), the Amended Answer and Counterclaim dated November 12, 2015 (Doc. 32)( the

"Amended Counterclaim") of Defendants, Tammy Hussin and the Law Office of Tammy Hussin,

P.C. ("Defendants or "Hussin") included many irrelevant, impertinent, scandalous, immaterial and

expressly confidential allegations.

By December 18, 2015, *sua sponte* Order, this Court ordered Defendants to replead as

follows:

> **ORDER. Plaintiff has filed a [42] Motion to Dismiss and Motion to Strike. On or before
> January 7, 2016, Defendants shall either file a response to the motion or file an
> amended answer with counterclaims pleading as many facts as possible, consistent with
> Rule 11 of the Federal Rules of Civil Procedure, to address the alleged defects discussed**

**in Plaintiff's memorandum of law. The Court will not allow further amendments after January 7, 2016. If Defendants choose to amend and if Plaintiff then renews the motion to dismiss, Plaintiff may incorporate by reference any prior briefing.**

In an attempt to comply with the Court's Order, Defendants have now filed the Second Amended Answer, Affirmative Defenses, And Amended Counterclaim ("SAC")(Doc. 48).   The SAC complies with the Court's Order only in so far as the Defendants have removed some of the most egregiously offensive, irrelevant, confidential and inappropriate portions of its pleading. Gone are purported irrelevant quotations from the parties' exchanges.   Gone is the fairy tale about an allegedly mistrustful client "John Doe" (Amended Counterclaim¶¶ 68-74), who, Mr. Lemberg's affidavit established, invited Ms. Hussin to meet him at his home; gone is "Eric Doe", who purportedly was not able to reach Ms. Hussin and did not know the Lemberg firm represented him, but as shown in Mr. Lemberg's affidavit, was completely cooperative with the Lemberg firm's prosecution of his case.  Moreover, gone are the allegations pertaining to ethics complaints, which both Connecticut and California rules deem completely confidential.[1]

However, the SAC, in substantial part, fails to comport to the Court's Order to plead facts consistent with Rule 11 of the Federal Rules of Civil Procedure.  As shown below, it still includes a number of improper and irrelevant statements, which should be struck under Rule 12(f). Furthermore, the SAC fails to address the substantive failings and deficiencies of the claims interposed in the Amended Complaint.  Instead of complying, the SAC suffers from the same fatal flaws that plagued its predecessor.  Defendants lack standing to bring many of the claims as alleged. Specifically, Defendants seek relief based upon harm allegedly suffered by third parties who are not

---

[1] Because the facts pertaining to these complaints are confidential by statute, in both Connecticut and California, Plaintiff is concurrently moving to expunge any mention of them from the public record, and for appropriate sanctions.

parties to or participants in this litigation and the Court should dismiss such claims pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.  Defendants fail to plead facts giving rise to their other claims, and Defendants' Counts One, Two, Three, Four, Five and Seven and should be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Nor, despite much spilled ink, have Defendants managed to plead two of the three Affirmative Defenses.

Defendants attempt to position themselves as a modern day Robin Hood, standing up for the rights of aggrieved "Californians" and other allegedly fleeced clients of the Lemberg Firm, not only here but also in a barrage of voluminous, and now dismissed, ethics filings.   The motive here is, regrettably, transparent: Plaintiff reminds the Court that Ms. Hussin had indicated to Attorney Lemberg that she would be escrowing money she owed to Lemberg Law firm in a separate account. Immediately after suit was filed, Plaintiff's counsel began demanding these escrow records from Ms. Hussin. Ms. Hussin produced a bank statement and spreadsheet showing that she purported to escrow some of the settlement funds. Exhibit A to Lemberg Affidavit ¶ 25.   Plaintiff's counsel has repeatedly pressed Ms. Hussin to produce all bank records and an accounting of the escrowed funds that she is required to maintain under California rules, as summarized in California State Bar Formal Opinion 2008-175.

Ms. Hussin has failed to produce the bank records. Plaintiff was forced to subpoena said records from the bank in question.  Ms. Hussin objected to the production, and the records have yet to be produced.  Ms. Hussin advised Plaintiff's counsel, and testified at yesterday's deposition, that she no longer has money in the escrow account, having transferred the monies to a brokerage account, comingled it with her own, and spent a portion of it for her own purposes.  Lemberg Affidavit ¶¶ 23-28.

## SUMMARY OF RELEVANT FACTS

At the Court's suggestion, Plaintiff incorporates the Summary of Relevant Facts included in its Motion to Dismiss (pp. 2–5).

## ARGUMENT

### A.    Motion to Strike Pursuant to Rule 12(f).

Rule 12(f) of the Federal Rules of Civil Procedure provides that, upon motion, a court may strike from a pleading "any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  In considering a motion to strike, the court does not examine the merits of the action, but merely determines whether any matter contained in the pleading itself was improperly included. Because pleadings are to be construed liberally, motions to strike generally are not favored and will be granted only upon a showing that the allegations in question have no possible bearing on the subject matter of the litigation. *Schramm v. Krischell,* 84 F.R.D. 294, 299 (D.Conn.1979) Allegations are impertinent and immaterial if proof concerning the allegation could not be received at trial. *Mahon v. Chicago Title Ins. Co.,* No. 3:09cv690 (AWT), 2009 WL 4268372 (D.Conn. Nov. 24, 2009); *Lipsky v. Commonwealth United Corp.,* 551 F.2d 887, 893 (2d Cir.1976). As summarized by Judge Eginton in *Kent v. AVCO Corp.*, 815 F.Supp. 67 (D .Conn.1992):

> However, immaterial allegations should be stricken if their presence in the complaint prejudices the defendant. *Fuchs Sugars & Syrups, Inc. v. Amstar Corp.*, 402 F.Supp. 636, 638 (S.D.N.Y.1975). "Where the materiality of the alleged matter is highly unlikely, or where its effect would be prejudicial the Court may order it stricken." *Reiter's Beer Distributors, Inc. v. Christian Schmidt Brewing Co.*, 657 F.Supp. 136, 144 (E.D.N.Y.1987); *Atlantic City Electric Co. v. General Electric Co.*, 207 F.Supp. 620, 624 (S.D.N.Y.1962).

### B.    Numerous Paragraphs of Defendants' Counterclaim Should Be Stricken

The SAC continues to contain numerous immaterial, scandalous and irrelevant allegations. The allegations serve only as an attempt to embarrass or harass Lemberg Law and its principal

Sergei Lemberg, Esq.  These unsupported allegations are not only immaterial to Defendants' Counterclaim, but also prejudicial, impertinent and scandalous; they should be stricken from the Counterclaim and removed from the public record.

 The Original Motion referred to these  categories as:1) Impertinent and scandalous allegations and 2) irrelevant allegations.

### 1)   *Impertinent and scandalous allegations*

Defendant has not followed the Court's admonition – the impertinent and scandalous allegations were merely rephrased, rather than removed. The Court should now strike them. The word "scandalous" in Rule 12(f) "generally refers to any allegation that unnecessarily reflects on the moral character of an individual or states anything in repulsive language that detracts from the dignity of the court." *Pigford v. Veneman*, 225 F.R.D. 54 (D.D.C. 2005) see also 2 MOORE'S FEDERAL PRACTICE § 12.37[3] at 12–97; *In re 2TheMart.com Inc. Securities Litigation*, 114 F.Supp.2d 955, 965 (C.D.Cal.2000) ("scandalous" includes allegations that cast "a cruelly derogatory light on a party or other person").

Specifically, Defendants make the following scandalous and outrageous allegations that are merely rephrased rather than removed entirely:

| Amended Counterclaim | Second Amended Counterclaim (SAC) |
|---|---|
| 183. Lemberg repeatedly demanded that Hussin, not Lemberg, withdraw from the Horton Class Action. Lemberg continued to verbally assault Hussin in emails, telling Hussin: "I'm going to "ruin you," "bankrupt you," and likened her to a "dead cat." | 178. The process issued in this case, to wit, the summons and complaint, were issued on behalf of plaintiff against defendants without probable cause and with the specific intention, as alleged above, of not seeking the relief set forth in the Complaint, but as a guise to attempt to improperly scare and stop Hussin from asserting her entitlement in the Horton Class Action, as retaliation for certain complaints initiated by Hussin against Lemberg, and to bankrupt and cause Hussin financial ruin, and to generally harass, annoy, embarrass, and cost defendant sums to defend the action, all of which purposes are improper purposes for issuing process. |
| 184. Lemberg's threats caused Hussin to fear for her personal safety and caused Hussin great distress. | *Removed* |
| 185. Lemberg continued to threaten Hussin and demand that she withdraw from the Horton Class Action. | 123. Lemberg thereafter began threatening Hussin with financial ruin and repeatedly demanded that she withdraw from the Horton Class Action. 138. As soon as Hussin reasserted her interest in the Horton Class Action, Lemberg renewed his threats to sue Hussin and as a result filed this action against Hussin to cause her to forego her portion of any fees earned in the Horton matter. |
| 221. Lemberg is a liar, a thief, and conducts his "consumer protection" practice with little regard for those he portends to protect, and has harmed his clients and Hussin by his unlawful acts. | *Removed* |

The Defendants' insinuations continue to "improperly cast[ ] a derogatory light" on a dedicated attorney who has done his best to navigate a difficult partnership between two strong minded individuals. 5C Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE & PROCEDURE § 1382 (3d ed.2004). Furthermore, it is well settled law that "[A]busive language toward opposing counsel has no place in documents filed with our courts; the filing of a document containing such language is one form of harassment prohibited ..." *Coats v. Pierre,* 890 F.2d 728, 734 (5th Cir.1989), *see* John G. Koeltl, *The Argument for Civility,* 23 LITIGATION 66 (Spring 1997) ("Judges are not impressed by papers that hurl epithets against the other side. Memoranda that are personally insulting to an adversary are also often offensive to the Court."). The statements bear no relationship or relevance to any claims of the Plaintiff, any validly stated counterclaims, or any affirmative defenses in this action.

The Plaintiff has suffered prejudice and harm as a result of these allegations in one or more of the following ways:

1)      The Amended Answer and Counterclaim has been circulated to the consumer law bar nationwide and in Connecticut, causing a number of inquiries from colleagues.  See Lemberg Affidavit ¶ 33.

2)      The Amended Answer and Counterclaim has been circulated to the defense bar nationwide and in Connecticut. See Lemberg Affidavit ¶ 34.

3)      In addition to professional embarrassment, Plaintiff has received inquiries from trade newspapers concerning the allegations.  See Lemberg Affidavit ¶ 35.

4)      Having spent Plaintiff's escrow money and seeking some perceived leverage, Ms. Hussin has sent her pleading to Bar Counsel in Connecticut and the Connecticut Attorney General.

See Lemberg Affidavit ¶ 36. Note consider she is required to send it AG under CUTPA claim

The accusations and abusive language, even watered down, have no relevance to any of Defendants' viable counterclaims and should be stricken.

### 2)   Irrelevant allegations

Defendants allege a series of allegations regarding injuries that third-parties may have suffered as a result of the Lemberg's alleged conduct.  Defendant fails, however, to explain, as this Court Ordered, how the allegations pertain to the fee sharing claims or defenses in this action. Even if these allegations are true, which Lemberg vehemently disputes, they have no relevancy to the claims or defenses.   The allegations in question are:

| Amended Counterclaim | Second Amended Counterclaim (SAC) |
|---|---|
| 137.  In or around March of 2014, Hussin settled a Filed Case for Brittany Dixon. Dixon was a PrivacyStar Client who had no knowledge she had retained a law firm. | 91. In or around March of 2014, Hussin settled a Filed Case for Brittany Dixon. Dixon received a settlement statement and settlement payment from Lemberg. |
| 138.  On March 29, 2014, Dixon received a settlement statement and settlement payment from Lemberg. | Now Par. 91 |
| 139. Dixon contacted Hussin to object to the high cost which was deducted from her settlement. Hussin advised Dixon she had no knowledge of the actual costs, and provided Dixon with Lemberg's contact information. | 94. Not knowing at the time about PrivacyStar, Hussin questioned Lemberg about the high cost deducted from Dixon's settlement. Lemberg told Hussin the cost was accurate.<br> 95. Hussin began to distrust Lemberg's manner of distributing proceeds from cases Hussin settled. |

| | |
|---|---|
| 140.  Lemberg spoke to Dixon and advised her the cost deductions from her settlement were | Omitted |
| 141.  Unbeknownst to Hussin at the time, Lemberg had deducted a $595 PrivacyStar cost from Dixon's settlement. | 92. Unbeknownst to Hussin at the time, Lemberg had deducted a $595 PrivacyStar cost from Dixon's settlement. The PrivacyStar cost deducted from Dixon's settlement caused Dixon's settlement proceeds to be reduced and therefore and caused Hussin's share of the attorneys fees to be reduced. |
| 142.  The PrivacyStar cost deducted from Dixon's settlement caused Dixon's settlement proceeds to be reduced. | Now Par. 92 (above) |
| 143.  The PrivacyStar cost deducted from Dixon's settlement caused Hussin's share of the attorney's fees to be reduced. | 92. Unbeknownst to Hussin at the time, Lemberg had deducted a $595 PrivacyStar cost from Dixon's settlement. The PrivacyStar cost deducted from Dixon's settlement caused Dixon's settlement proceeds to be reduced and therefore and caused Hussin's share of the attorneys fees to be reduced. |
| 144.  Upon information and belief garnered from Stalnaker, PrivacyStar never charged $595 for an individual referral, and Lemberg never paid $595 for an individual referral. In fact, although Lemberg charged Dixon, and an untold number of others, a $595 PrivacyStar cost, Stalnaker never charged Lemberg more than $45 for any individual PrivacyStar referral. | 93. Upon information and belief garnered from Stalnaker, PrivacyStar never charged $595 for an individual referral, and Lemberg never paid $595 for an individual referral. In fact, although Lemberg charged Dixon, and upon belief, others, a $595 PrivacyStar cost, Stalnaker never charged Lemberg more than $45 for any individual PrivacyStar referral. |

| | |
|---|---|
| 145.  Not knowing at the time about PrivacyStar, Hussin questioned Lemberg about the high cost deducted from Dixon's settlement.<br><br>Lemberg insisted the cost was accurate. | 94. Not knowing at the time about PrivacyStar, Hussin questioned Lemberg about the high cost deducted from Dixon's settlement. Lemberg told Hussin the cost was accurate. |
| ****** | |
| 147. In or around the middle of May, 2014, Hussin discovered one of her Pre-litigation cases for client, Sara "Doe" ("Sara") had settled, but Lemberg had not paid Hussin the agreed upon a fee. | 96. In or around the middle of May, 2014, Hussin discovered one of her Pre-litigation cases for client, Sara "Doe" ("Sara") had settled, but Lemberg had not paid Hussin the agreed upon a fee. |
| 148. Hussin went to search for Sara's case file on Lemberg's database and noticed Lemberg had, without prior notice or Hussin's consent, blocked Hussin's access to only California cases on Lemberg's database. | 97. Hussin discovered Lemberg had moved Sara's case file from California to Massachusetts in his database. Having blocked Hussin's access to view cases in other states, Hussin was no longer able to see or access Sara's file. |
| 149. Lemberg moved Sara's case file from California to Massachusetts in his database. Having blocked Hussin's access to view cases in other states, Hussin was no longer able to see or access Sara's file. | *Removed* |
| 150. Hussin discovered that her signature had been affixed to Sara's settlement agreement without Hussin's knowledge or consent. | 98. Hussin also discovered that her signature had been affixed to Sara's settlement agreement without Hussin's knowledge or consent. |
| 151. Hussin had neither seen, nor approved of Sara's settlement agreement, and had no knowledge her signature had been forged on the settlement agreement. | 99. Hussin had neither seen, nor approved of Sara's settlement agreement, and had no knowledge her signature had been forged on the settlement agreement. I might delete this one |

| | |
|---|---|
| 163.     In addition to charging Dixon, Lemberg also charged other PrivacyStar Clients a $595 PrivacyStar cost. | 111. In addition to charging Dixon, Lemberg also charged other PrivacyStar Clients a $595 PrivacyStar cost. |
| 164.     Lemberg also deducted "Administrative Costs" from client settlements in Pre-litigation Cases, even though Lemberg incurred no costs on cases which Hussin resolved on a pre-litigation basis. | 112. Lemberg also deducted "Administrative Costs" from client settlements in Pre-litigation Cases, even though Lemberg incurred no costs on cases which Hussin resolved on a pre-litigation basis. |
| 165.     The Administrative Costs assessed to the settlements in Hussin's Pre-litigation Cases were not in fact incurred by Lemberg and were not discussed with Hussin. | 113. The Administrative Costs assessed to the settlements in Hussin's Pre-litigation Cases were not in fact incurred by Lemberg and were not discussed with Hussin. |
| 166.     The Administrative Costs assessed to the settlements in Hussin's Pre-litigation cases were not discussed with the clients, nor did clients agree to pay Lemberg Administrative Costs upon the settlement of their cases. | 113. The Administrative Costs assessed to the settlements in Hussin's Pre-litigation Cases were not in fact incurred by Lemberg and were not discussed with Hussin. |

Despite minor rephrasing, the fact remains that the majority of these allegations have got nothing to do with this case.  In addition to being completely irrelevant, Defendants have no good-faith basis for these allegations, as they are wholly inaccurate. See Lemberg Affidavit ¶¶ 48 – 58. Indeed, Ms. Hussin, as the admitted California attorney working for Lemberg had the duty to police this issue and she herself approved the Legal Services Agreement and disbursements  used with Lemberg clients without raising any issue as to such fees. Id. ¶¶55-58.

Plaintiff is prejudiced by the inclusion of these allegations by Defendants.  Plaintiff cannot defend allegations regarding harm suffered by third parties, and, as discussed below, Defendants

have no standing to add such claims to this case.  The cost of subpoenaing unrelated third parties for deposition will be significant, compared with the *de minimum* damages Defendants can be claimed to have suffered even if their far flung claims succeed past outright dismissal.  This is an unnecessary cost and burden to the Plaintiff, given the claims do not belong to Defendants.  Plaintiff has suffered further prejudice in the form of professional and personal harm to Plaintiff's reputation as discussed above.  Id.  ¶¶ 33-36.

In addition, -Plaintiff requests that the Court strike the following paragraphs of the Counterclaim: Pars. 8-30 describing Defendants perception of the PrivacyStar relationship; Pars. 31-40 pertaining to Lemberg Law's ProLaw system; and Pars. 41-59 pertaining to "unresponsive" or uncooperative clients.  The "allegations" do not pertaining to any claim for relief or affirmative defense, and their inclusion will not help Defendants make out any claim or defense in the complaint.  Nor do Paragraphs 96-101 pertaining to alleged "forgery" belong in the pleading.  There is no Counterclaim for forgery in SAC, and the inflammatory allegations do not serve any legitimate purpose in the pleading.  They should be stricken from the plead.

All the allegations set forth above contain impertinent, immaterial, scandalous, irrelevant and prejudicial allegations that should be stricken from the public record pursuant to Rule 12(f) of the Federal Rules of Civil Procedure.

**C.     Motion to Dismiss for Lack of Standing and Hence Lack of Subject Matter Jurisdiction Under Rule 12(b)(1).**

Plaintiff renews the motion to dismiss for lack of standing. A motion to dismiss under Rule 12(b)(1) challenges the court's subject matter jurisdiction over the claims asserted. "Once challenged, the party asserting subject matter jurisdiction has the burden of proving its existence." *Rattlesnake Coalition v. United States Environmental Protection Agency,* 509 F.3d 1095, 1102 n. 1

(9th Cir.2007).  A defendant may pursue a Rule 12(b)(1) motion to dismiss for lack of jurisdiction either as a facial challenge to the allegations of a pleading, or as a substantive challenge to the facts underlying the allegations. *Savage v. Glendale Union High School, Dist. No. 205, Maricopa County,* 343 F.3d 1036, 1039 n. 2 (9th Cir.2003).  A facial challenge to the jurisdictional allegations is one which contends that the allegations "are insufficient on their face to invoke federal jurisdiction." *Safe Air for Everyone v. Meyer,* 373 F.3d 1035, 1039 (9th Cir.2004).  The success of a facial challenge to jurisdiction depends on the allegations in the complaint, and does not involve the resolution of a factual dispute. *Wolfe v. Strankman,* 392 F.3d 358, 362 (9th Cir.2004). In a facial challenge the court must assume the allegations in the complaint are true and it must "draw all reasonable inferences in [plaintiff's] favor." *Wolfe,* 392 F.3d at 362.

"Federal courts are courts of limited jurisdiction," having the power to hear cases only as authorized by the Constitution and by Congress. *Kokkonen v. Guardian Life Ins. Co.,* 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994).  Article III of the United States Constitution "limits the jurisdiction of federal courts to 'cases' and 'controversies.'" *San Diego County Gun Rights Committee v. Reno,* 98 F.3d 1121, 1126 (9th Cir.1996).  Standing is an "essential and unchanging part" of this case-or-controversy requirement. *Wolfson v. Brammer,* 616 F.3d 1045, 1056 (9th Cir.2010). As the party invoking federal jurisdiction, a plaintiff bears of burden establishing standing to sue. *San Diego County,* 98 F.3d at 1126.

At an "irreducible constitutional minimum," Article III standing requires proof "(1) that the plaintiff suffered an injury in fact that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical;' (2) of a causal connection between the injury and the complained-of conduct; and (3) that a favorable decision will likely redress the alleged injury." *Alaska Right to Life*

*Political Action Committee v. Feldman,* 504 F.3d 840, 848 (9th Cir.2007) (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, "[a] case is properly dismissed for lack of subject matter jurisdiction ... when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000). The party who seeks to invoke a court's jurisdiction bears the burden of establishing that jurisdiction. *Thompson v. Cnty. of Franklin,* 15 F.3d 245, 249 (2d Cir.1994) (citing *Warth v. Seldin,* 422 U.S. 490, 518, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). A plaintiff must allege facts demonstrating that the plaintiff is a proper party to seek judicial resolution of the dispute. *Id.* Thus, to survive Plaintiff's Rule 12(b)(1) motion to dismiss, Defendants must allege facts that affirmatively and plausibly suggest that it has standing to sue. *See Selevan v. N.Y. Thruway Auth.,* 584 F.3d 82, 88 (2d Cir.2009) (citing *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1950, 173 L.Ed.2d 868 (2009)); *see also* <u>Amidax Trading Grp. v. S.W.I.F.T. SCRL</u>, 671 F.3d 140, 145 (2d Cir. 2011).

### 1) *Certain of Defendants' Claims Should Be Dismissed for Lack of Standing as Defendants Cannot Bring Claims on Behalf of Third Parties.*

Here, Defendants have not cured the shortcomings of their claims, because they cannot make it over the threshold hurdle of establishing that they have has suffered an injury in fact for purposes of satisfying the first element of Article III standing.  Defendants' Counterclaim attempts to bring claims on behalf of former clients.

Defendants' Counterclaim is difficult to decipher as it intersperses allegations of harm as to third parties with allegations of harm as to the Defendants themselves.  This Court should dismiss those claims pertaining to Defendants' attempts to bring claims and recover damages on behalf of third parties.

In *Pony v. Cty. of Los Angeles*, 433 F.3d 1138 (9th Cir. 2006) an attorney intervened in a former client's civil rights case under § 1983, seeking attorney's fee award based on a settlement of the case. The defendant City of Los Angeles moved to dismiss the claim for lack of standing pursuant to Federal Rule of Civil Procedure 12(b)(1).  The Ninth Circuit Court of Appeals dismissed the attorney's claim on multiple grounds. *Id*   First, because the Supreme Court has held that Section 1988 vests the right to seek attorney's fees in the prevailing party, not her attorney, and that attorneys therefore lack standing to pursue them. *Id.* citing *Evans v. Jeff D.,* 475 U.S. 717, 730–32, 106 S.Ct. 1531, 89 L.Ed.2d 747 (1986). Once the prevailing party exercises her right to receive fees, the attorney's right to collect them vests, and he may then pursue them on his own. *Id.* citing *United States ex rel. Virani v. Jerry M. Lewis Truck Parts & Equip., Inc.,* 89 F.3d 574, 577 (9th Cir.1996).  Unless and until the party exercises this power, however, the attorney has no right to collect fees from the non-prevailing party, and the non-prevailing party has no duty to pay them.  *Id.*.  Therefore, the attorney had no contractual standing to seek fees.  Second, the Court examined whether the Attorney had direct standing under Article III of the United States Constitution.  *Id.* In applying the test for direct standing, the Court ruled that:

> Generally, a plaintiff may only bring a claim on his own behalf, and may not raise claims based on the rights of another party. *See Allen,* 468 U.S. at 751, 104 S.Ct. 3315 ("Standing doctrine embraces several judicially self-imposed limits on the exercise of federal jurisdiction, such as the general prohibition on a litigant's raising another person's legal rights...."). However, "[v]endors and those in like positions have been uniformly *1147 permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function." *Craig v. Boren,* 429 U.S. 190, 195, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (holding that a vendor of alcoholic beverages had standing to bring an equal protection challenge to a law setting a different drinking age for males and females on behalf of her would-be customers); *see also U.S. Dep't of Labor v. Triplett,* 494 U.S. 715, 720–21, 110 S.Ct. 1428, 108 L.Ed.2d 701 (1990) (holding that an attorney who had allegedly collected illegal fees under the Black Lung Benefits Act had standing to raise black lung benefit claimants' due process right to legal representation); *Caplin & Drysdale, Chartered v. United States,* 491 U.S. 617, 623–24, 109 S.Ct. 2646, 105

L.Ed.2d 528 (1989) (holding that law firm had third-party standing to challenge a drug forfeiture statute on behalf of Sixth Amendment rights of an existing client where forfeited assets were needed to pay attorney's fees); *Barrows v. Jackson,* 346 U.S. 249, 254–58, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953) (holding, in a suit to enforce a racially restrictive land covenant, that white sellers of land have standing to litigate the constitutional rights of potential black purchasers). *But see Conn v. Gabbert,* 526 U.S. 286, 292–93, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999) (holding that attorney did not have standing to assert his client's alleged right as a grand jury witness to have counsel present outside the jury room). Mitchell attempts to fit this case into the holdings of this line of cases by arguing that, as Pony's attorney, he has third-party standing to challenge the County's settlement policy on her behalf.

However, this case differs from all of these other cases in one fundamental way: It is clear in this case that Pony, the holder of the rights at issue, does not wish to assert them.

*Id.*

The situation rejected in *Jerry M. Lewis Truck Parts & Equip., Inc.,* is very similar to the claims that the Defendants seek to exploit here.  It is clear that the only people eligible to bring many of these claims, for allegedly inappropriate costs charged on settlements, against the Plaintiff are the former clients themselves.  Each former client might have the right to seek a reimbursement of fees or costs if they believed they were improperly charged.  None of these former Lemberg clients ever has. Clearly, Hussin has no right to pursue these claims on behalf of parties she does not purport to currently represent and in a case where she and her firm are the sole Counterclaimants.

 In *Kowalski v. Tesmer*, 543 U.S. 125, 125 S. Ct. 564, 160 L. Ed. 2d 519 (2004), the Supreme Court, Chief Justice Rehnquist, held that attorneys lacked third-party standing to bring action on behalf of hypothetical future clients.  There, an attorney sought to assert a claim on behalf of future Michigan indigent defendants denied appellate counsel.   In deciding whether to grant third-party standing, the Court asked whether the party asserting the right has a "close" relationship with the person who possesses the right, and whether there is a "hindrance" to the possessor's ability to protect his own interests. *Id*. citing *Powers v. Ohio,* 499 U.S. 400, 411, 111 S.Ct. 1364, 113

L.Ed.2d 411.  The attorneys there claimed standing based on a future attorney-client relationship with as yet unascertained Michigan criminal defendants who will request, but be denied, appellate counsel under the statute. *Id.*  Nevertheless, the Court determined that attorneys did not have a "close relationship" with their alleged "clients"; indeed, they have no relationship at all, therefore, they did not have standing to pursue the claim. *Id.*

Here, Defendants also seek to bring claims on behalf of third parties:

| Amended Counterclaim | Second Amended Counterclaim (SAC) |
| --- | --- |
| 137.  In or around March of 2014, Hussin settled a Filed Case for Brittany Dixon. Dixon was a PrivacyStar Client who had no knowledge she had retained a law firm. | 91. In or around March of 2014, Hussin settled a Filed Case for Brittany Dixon. Dixon received a settlement statement and settlement payment from Lemberg. |
| 138.  On March 29, 2014, Dixon received a settlement statement and settlement payment from Lemberg. | Now Par. 91 |
| 139. Dixon contacted Hussin to object to the high cost which was deducted from her settlement. Hussin advised Dixon she had no knowledge of the actual costs, and provided Dixon with Lemberg's contact information. | 94. Not knowing at the time about PrivacyStar, Hussin questioned Lemberg about the high cost deducted from Dixon's settlement. Lemberg told Hussin the cost was accurate.  95. Hussin began to distrust Lemberg's manner of distributing proceeds from cases Hussin settled. |
| 140.  Lemberg spoke to Dixon and advised her the cost deductions from her settlement were | Omitted |
| 141.  Unbeknownst to Hussin at the time, Lemberg had deducted a $595 PrivacyStar cost from Dixon's settlement. | 92. Unbeknownst to Hussin at the time, Lemberg had deducted a $595 PrivacyStar cost from Dixon's settlement. The PrivacyStar cost deducted from Dixon's settlement caused Dixon's settlement proceeds to be reduced and therefore |

| | and caused Hussin's share of the attorneys fees to be reduced. |
|---|---|
| 142. The PrivacyStar cost deducted from Dixon's settlement caused Dixon's settlement proceeds to be reduced. | Now Par. 92 (above) |
| 143. The PrivacyStar cost deducted from Dixon's settlement caused Hussin's share of the attorney's fees to be reduced. | 92. Unbeknownst to Hussin at the time, Lemberg had deducted a $595 PrivacyStar cost from Dixon's settlement. The PrivacyStar cost deducted from Dixon's settlement caused Dixon's settlement proceeds to be reduced and therefore and caused Hussin's share of the attorneys fees to be reduced. |
| 144. Upon information and belief garnered from Stalnaker, PrivacyStar never charged $595 for an individual referral, and Lemberg never paid $595 for an individual referral. In fact, although Lemberg charged Dixon, and an untold number of others, a $595 PrivacyStar cost, Stalnaker never charged Lemberg more than $45 for any individual PrivacyStar referral. | 93. Upon information and belief garnered from Stalnaker, PrivacyStar never charged $595 for an individual referral, and Lemberg never paid $595 for an individual referral. In fact, although Lemberg charged Dixon, and upon belief, others, a $595 PrivacyStar cost, Stalnaker never charged Lemberg more than $45 for any individual PrivacyStar referral. |
| 145. Not knowing at the time about PrivacyStar, Hussin questioned Lemberg about the high cost deducted from Dixon's settlement.<br><br>Lemberg insisted the cost was accurate. | 94. Not knowing at the time about PrivacyStar, Hussin questioned Lemberg about the high cost deducted from Dixon's settlement. Lemberg told Hussin the cost was accurate. |
| ****** | |

| | |
|---|---|
| 147. In or around the middle of May, 2014, Hussin discovered one of her Pre-litigation cases for client, Sara "Doe" ("Sara") had settled, but Lemberg had not paid Hussin the agreed upon a fee. | 96. In or around the middle of May, 2014, Hussin discovered one of her Pre-litigation cases for client, Sara "Doe" ("Sara") had settled, but Lemberg had not paid Hussin the agreed upon a fee. |
| 148. Hussin went to search for Sara's case file on Lemberg's database and noticed Lemberg had, without prior notice or Hussin's consent, blocked Hussin's access to only California cases on Lemberg's database. | 97. Hussin discovered Lemberg had moved Sara's case file from California to Massachusetts in his database. Having blocked Hussin's access to view cases in other states, Hussin was no longer able to see or access Sara's file. |
| 149. Lemberg moved Sara's case file from California to Massachusetts in his database. Having blocked Hussin's access to view cases in other states, Hussin was no longer able to see or access Sara's file. | *Removed* |
| 150. Hussin discovered that her signature had been affixed to Sara's settlement agreement without Hussin's knowledge or consent. | 98. Hussin also discovered that her signature had been affixed to Sara's settlement agreement without Hussin's knowledge or consent. |
| 151. Hussin had neither seen, nor approved of Sara's settlement agreement, and had no knowledge her signature had been forged on the settlement agreement. | 99. Hussin had neither seen, nor approved of Sara's settlement agreement, and had no knowledge her signature had been forged on the settlement agreement. |
| 163.     In addition to charging Dixon, Lemberg also charged other PrivacyStar Clients a $595 PrivacyStar cost. | 111. In addition to charging Dixon, Lemberg also charged other PrivacyStar Clients a $595 PrivacyStar cost. |
| 164.     Lemberg also deducted "Administrative Costs" from client settlements in Pre-litigation Cases, even though Lemberg incurred no costs on cases which Hussin resolved on a pre-litigation basis. | 112. Lemberg also deducted "Administrative Costs" from client settlements in Pre-litigation Cases, even though Lemberg incurred no costs on cases which Hussin resolved on a pre-litigation basis. |

| | |
|---|---|
| 165.    The Administrative Costs assessed to the settlements in Hussin's Pre-litigation Cases were not in fact incurred by Lemberg and were not discussed with Hussin. | 113. The Administrative Costs assessed to the settlements in Hussin's Pre-litigation Cases were not in fact incurred by Lemberg and were not discussed with Hussin. |
| 166.    The Administrative Costs assessed to the settlements in Hussin's Pre-litigation cases were not discussed with the clients, nor did clients agree to pay Lemberg Administrative Costs upon the settlement of their cases. | 113. The Administrative Costs assessed to the settlements in Hussin's Pre-litigation Cases were not in fact incurred by Lemberg and were not discussed with Hussin. |

These allegations are incorporated in each of Defendants' seven counts and each claim should be dismissed, as Defendants have no standing to bring such claims against Plaintiff.  It is particularly inappropriate for Defendants to advance such claims as Defendants served as Lemberg's California office and it was Ms. Hussin who personally represented these clients.[3]

The Defendants have not, and cannot, meet the test for standing under Article III of the United States Constitution as to such claims governing Lemberg's relationships with parties who have never asserted such claims and are not before the Court.  Defendants no longer have any relationship with the named former clients who settled their cases.  The Court could render no decision or grant relief as to the Defendants claims.  Therefore, the Court should dismiss all of Defendants' claims seeking relief on behalf of third parties.

**D.     Motion to Dismiss for Failure to State a Claim Under Rule 12(b)(6).**

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) should be granted when "it is clear that no relief could be granted under any set of facts that could be proved consistent

---

[3] It is also hard to see how CUTPA would govern the cost and fee arrangements between Hussin and these former California clients given that the transactions took place in California and not in Connecticut.   Hate this line we sent bills to client from Conencticut

with the allegations." *Hishon v. Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). The function of a motion to dismiss is "merely to assess the legal feasibility of a complaint, not to assay the weight of evidence which might be offered in support thereof." *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.,* 748 F.2d 774, 779 (2d Cir.1984) (quoting *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980)). "In adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration 'to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken.'" *Leonard F. v. Israel Discount Bank,* 199 F.3d 99, 107 (2d Cir.1999) (quoting *Allen v. WestPoint–Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir.1991)).

When deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept the material facts alleged in the complaint as true, draw all reasonable inferences in favor of the plaintiff, and decide whether it is plausible that the plaintiff has a valid claim for relief. *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949–50, 173 L.Ed.2d 868 (2009); *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1969, 167 L.Ed.2d 929 (2007); *Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996).

Under *Twombly,* "factual allegations must be enough to raise a right to relief above the speculative level," and assert a cause of action "with enough heft to show entitlement to relief ... and enough facts to state a claim to relief that is plausible on its face." 550 U.S. at 555, 570, 127 S.Ct. 1955; *Iqbal,* 129 S.Ct. 1937, 1950 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). The plausibility standard set forth in *Twombly* and *Iqbal* obligates the plaintiffs to "provide the grounds of [their] entitlement to relief" through more than "labels and conclusions, [or] a formulaic recitation of the elements of [their] cause[s] of action," *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955.

With regard to Affirmative Defenses, judges within the District of Connecticut generally hold that these cases have not altered the traditional three-factor test: (1) there is no question of fact which might allow the defense to succeed; (2) there is no question of law which might allow the defense to succeed; and (3) the plaintiff would be prejudiced by the inclusion of the defense." *Vale v. City of New Haven Police Dept.*, No. 3:11-cv-632 (CSH), 2013 WL 5532133, at *2 (D. Conn. Oct. 4, 2013), *Whitserve, LLC v. GoDaddy.com, Inc.*, No. 3:11-cv-948 (JCH), 2011 WL 5825712, at *2 (D. Conn. Nov. 17, 2011); *Aros v. United Rentals, Inc.*, No. 3:10-cv-73 (JCH), 2011 WL 5238829, at *1 (D. Conn. Oct. 31, 2011)).  Under the traditional three-factor approach, an affirmative defense must "give[] the plaintiff fair notice of the nature of the defense." *MTA Metro-North R.R. v. Buchanan Marine, L.P.*, No. 3:05-cv-881 (PCD), 2006 WL 3544936, at *4 (D. Conn. Dec. 8, 2006); *Aros*, 2011 WL 5238829, at *5 (striking "unclear" affirmative defense where court could not "determine how th[e] allegation would constitute a legal or factual defense"); *Coach Inc.*, 756 F. Supp. 2d at 425 ("[C]onclusory assertions, absent any supporting factual allegations are insufficient as a matter of law and fail to provide a plaintiff with any notice as to how the defense applies to the plaintiff's claims.") (citing *Obabueki v. Int'l Bus. Machs. Corp.*, 145 F. Supp. 2d 371, 401 (S.D.N.Y. 2001)). "If a court determines that a defense is legally insufficient, the court must next determine whether inclusion of the defense would prejudice the plaintiff." *Coach Inc.*, 756 F. Supp. 2d at 425-26. Increases in the time and expense of trial and discovery demands "constitute sufficient prejudice to warrant striking an affirmative defense." *Id.* at 426 (citing *Estee Lauder, Inc. v. Origins Natural Res., Inc.*, 189 F.R.D. 269, 272 (S.D.N.Y. 1999) and *Specialty Minerals, Inc. v. PluessStaufer AG*, 395 F. Supp. 2d 109, 114 (S.D.N.Y. 2005)).

**E.    Defendants Affirmative Defenses Should be Dismissed for Failure to State a Claim.**

*1) The Court Should Dismiss Defendants' First Affirmative Defense*

Defendants' First Affirmative Defense (Material Breach) fails as a matter of law. Defendants claim that Plaintiff's numerous actions were so material that the defendants are excused from performing their obligation. In *Weiss v. Smulders*, 313 Conn. 227 (2014), the Connecticut Supreme Court stated:

> Under contract law, it is well settled that a material breach by one party discharges the other party's subsequent duty to perform on the contract ... Restatement (Second), supra, § 237 ("it is a condition of each party's remaining duties to render performances to be exchanged under an exchange of promises that there be no uncured material failure by the other party to render any such performance due at an earlier time"). Whether a breach is material depends on the circumstances of the case ... In addition to considering the multifactor standards for materiality of breach contained in § 241 of the Restatement (Second) of Contracts to assess whether a party's uncured failure to render or to offer performance discharges the other party's remaining duties to render performance, the Restatement (Second) of Contracts notes: "The reasonableness of the injured party's conduct in communicating his grievances and in seeking satisfaction is a factor to be considered in this connection." 2 Restatement (Second), supra, § 242, comment (b), p. 245. (Citations omitted.)

*Id.*, at 263–64.

In that case, the Supreme Court upheld the trial court's decision, which had ruled that the plaintiffs could not prevail on their claim that the defendants had materially breached their obligations under a distribution agreement because they failed to give notice of the alleged breach to the defendants as required under the terms of the agreement. Id., at 264–65. The court did not reach the question of whether the breach was material, finding that the plaintiffs had waived the right to assert that the breach was material because of the failure to provide the defendants with the required notice and an opportunity to cure. Id., at 265.

The court in *Weiss* relied on the 2 Restatement (Second), Contracts §§ 237, 241, and 242 (1981). Section 237 provides:

Except as provided in § 240,13 it is a condition of each party's remaining duties to render performances to be exchanged under an exchange of promises that there be no uncured material failure by the other party to render any such performance due at an earlier time. Section 241 provides:

In determining whether a failure to render or to offer performance is material, the following circumstances are significant: (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected; (b) the extent to which the injured party can be adequately compensated for that part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including reasonable assurances; (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

Defendants have simply failed to plead the requisite elements of the defense of Material Breach.  These three fatal flaws are as follows:  1) Although Hussin lists grievances against Lemberg – from ethical failings, to threats, to overcharges – she fails to plead that any of these shortcomings broke the terms of a contract between her and the Lemberg firm.  Although far-fetched, even accepted as true, none of the shortcomings is pled to be part of Hussin's contract with Lemberg Firm.  Hence none of the alleged wrongdoings could possibly constitute a material breach. 2) Hussin failed, despite three attempts and yet another 41 pages of pleading, to plead that any of Lemberg's failings breached a material provision of any contract or agreement.  Defendants mention the word 'material' in a conclusory fashion in Paragraphs 1 through 5, 8 and 9 of the First Affirmative Defense, but repetition does not establish validity, and it neither complies with the plausibility requirements mandated by Supreme Court precedent nor with this Court's Order mandating that facts be pled; 3) Finally, and most significantly, Hussin fails to plead that she provided a notice to

cure to the Plaintiff, and that each of Plaintiff's material breaches remain <u>uncured</u>.  Our law permits material breach as a defense only for uncured breaches. See 2 Restatement (Second), Contracts § 237 ("no uncured material failure"). In sum, without pleading that any terms were contractual, that they were material, and that said terms were not fulfilled despite a cure request, Hussin has simply failed to plead "Material Breach".

As stated earlier, allowing Defendants to litigate the Material Breach counterclaim based on wild, unsupported accusations and claims Defendants do not own would cause substantial prejudice to the Plaintiff and Mr. Lemberg.  The prejudice is particularly apparent because Defendants do not claim that any of the alleged wrongdoings were part of a contract or that they provided the requisite notice.  Therefore, the First Affirmative Defense should be dismissed with prejudice.

*2) Second Affirmative Defense (Unclean Hands) Should be Dismissed with Prejudice.*

Defendants persist in maintaining that the doctrine of "Unclean Hands" bars Plaintiff's claims, but fall far short of pleading the Affirmative Defense.

First and foremost, Defendants reallege and incorporate herein by this reference paragraphs 1 – 9 of their First Affirmative Defense, and all of the paragraphs in Defendants' Second Amended Counter-Claim.  It is thus impossible to have any fair notice on the face of the pleading which facts are relevant to this specific defense and which are not.  "The doctrine of unclean hands expresses the principle that where a plaintiff seeks equitable relief, he must show that his conduct has been fair, equitable and honest as to the particular controversy in issue.... Unless the plaintiff's conduct is of such a character as to be condemned and pronounced wrongful by honest and fair-minded people, the doctrine of unclean hands does not apply." (Citation omitted.) *Bauer v. Waste Management of Connecticut*, Inc., 239 Conn. 515, 525, 686 A.2d 481 (1996).

Neither this Court, nor the Plaintiff, should be forced to act as a truffle hog, searching through the piles of irrelevanices for what's relevant to this defense and what is not. Our Supreme Court has declared in *Thompson v. Orcutt*, 257 Conn. 301, 310-11, 777 A.2d 670, 677 (2001) that only the conduct that applies to the particular transaction which is the matter in litigation, not conduct without relation to anything involved in the suit, that counts:

> The doctrine generally "applies [only] to the <u>particular transaction</u> under consideration, for the <u>court will not go outside</u> the case for the purpose of examining the conduct of the complainant in other matters or questioning his general character for fair dealing. The wrong must ... <u>be in regard to the matter in litigation</u>.... Though an obligation be indirectly connected with an illegal transaction, it will not thereby be barred from enforcement, if the plaintiff does not require the aid of the illegal transaction to make out his case." (Citation omitted; internal quotation marks omitted*.) Id.; see also Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245, 54 S.Ct. 146, 78 L.Ed. 293 (1933) (courts "do not close their doors because of [a] plaintiff's misconduct, whatever its character, <u>that has no relation to anything involved in the suit</u>, but only for such violations of conscience as in some measure affect the equitable relations between the parties in respect of something brought before the court for adjudication"); *Orsi v. Orsi*, 125 Conn. 66, 70, 3 A.2d 306 (1938) (clean hands doctrine prevents "a party from asserting in court a title where, in order to do so, he must rely upon a transaction tainted with illegality or inequity"). In addition, the conduct alleged to be unclean must have been done directly against the interests of the party seeking to invoke the doctrine, rather than the interests of a third party. *Orsi v. Orsi*, supra, at 69–70, 3 A.2d 306 ("[t]he wrong must be done to the defendant himself and must be <u>in regard to the matter in litigation</u>" [internal quotation marks omitted] ).

Despite three tries, Defendants have yet to identify any wrongful or dishonest conduct that applies to a <u>particular transaction</u> that regards the <u>matter in litigation.</u>   Defendants have done, in fact, everything <u>but</u> fulfill the duty the law imposes on them or provide <u>fair</u> notice to Plaintiff. Defendants incorporate paragraphs that allege conduct by Lemberg Law but fail to identify what conduct, if any related to the agreement between Hussin and Lemberg Law.   For example, in the claims regarding the Lemberg Law and Privacystar relationship, Defendants allege that Lemberg Law's relationships with clients; they complained about "Eric Doe" and "John Does", about a "Sara" and a "Stephanie Dixon."   Those claims have got nothing to do with the matter at issue in this litigation – which is the

money Defendants owe Plaintiffs for cases Defendants took over, the intellectual property Defendants stole, and the minor counterclaims Defendants claim in the nature of an offset, which they have failed to plead.

Moreover, litigating the impossible vague "Unclean Hands" defense would impose a severe burden on Plaintiff and increase trial costs. The Second Affirmative Defense must thus be dismissed.

### F. Defendants Counterclaims Should Be Dismissed for Failure to State a Claim as Defendants Cannot Recover for Harm to Third Parties.

It is well settled, that dismissal is proper where the party cannot recover on the facts alleged. *See Ryder Energy Distribution Corp. v. Merrill Lynch Commodities Inc.,* 748 F.2d 774, 779 (2d Cir.1984).  Under *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1969, 167 L.Ed.2d 929 (2007*)* the "factual allegations must be enough to raise a right to relief above the speculative level," and assert a cause of action "with enough heft to show entitlement to relief ... and enough facts to state a claim to relief that is plausible on its face."  550 U.S. at 555, 570, 127 S.Ct. 1955.

Defendants cannot recover damages based on the facts alleged in their Second Amended Counterclaim.  As discussed above, Defendants' Second Amended Counterclaim seeks to recover damages for, and to protect, parties that are not subject to this litigation.  Even assuming these allegations are true, which Plaintiff vehemently denies, the Defendants cannot recover damages as a proxy for third parties.  Therefore, the Defendants have failed to state a claim upon which relief can be granted and the Court should dismiss all of Defendants Counterclaims seeking relief on behalf of third parties not before the Court.

#### 1) Breach of Contract (Count One)

Defendants fail to state a claim for Breach of Contract. "The elements of a breach of contract action are the formation of an agreement, performance by one party, breach of the agreement by the

other party and damages." (Internal quotation marks omitted.) *American Express Centurion Bank v. Head*, 115 Conn.App. 10, 15–16, 971 A.2d 90 (2009).

In the first instance, Defendants (Counter-plaintiffs) fail to plead that they and Lemberg Law had an agreement that included within it the terms that are claimed to have been breached.  There is no allegation, for instance, that Lemberg Law had any agreement with Defendants pertaining to any administrative fees, PrivacyStar fees, conversations with clients, treatment of expenses and various other sundry allegations poured thoughtlessly into the pleading.  Defendants fail to plead that any of these 'breaches' were in fact breaches of contractual terms.

Second, Defendants fail to plead their own performance.  It is well-established that "One cannot recover upon a contract unless he has fully performed his own obligation under it, has tendered performance, or has some legal excuse for not performing." *Automobile Ins. Co. v. Model Family Laundries, Inc.*, 133 Conn. 433, 437, 52 A.2d 137 (1947); *Shah v. Cover–It, Inc.*, 86 Conn.App. 71, 77, 859 A.2d 959 (2004). Defendants do not attempt to plead that they fulfilled their obligations to pay, which they admit was part of the agreement between the parties. (SAC - Par. 33 "Admitted to the extent Hussin agreed to Plaintiff receiving 40% of the legal fees").  They have not paid any of the promised 40% and have, to boot, raided the escrow account where some of that money had been set aside.

Nor have they pled the existence of a "legal excuse for not performing." As stated *supra* in the Material Breach section, Defendants have failed to set forth with any clarity or particularity any facts from which this Court can discern whether any of the various alleged wrongdoings were part of their contract with Lemberg Law.  That failure doomed the Affirmative Defendant of Material Breach, and it dooms the Breach of Contract counterclaim as well.

### 2) CUTPA (Count Two)

Defendants failed to cure any deficiencies in their CUTPA claims, and Count Two should be dismissed. Plaintiff incorporates its briefing in the Original Motion.  In sum, Defendants have failed to plead with particularity what claim they (as supposed to third parties – not located in Connecticut and lacking standing) suffered that would rise to a CUTPA violation. As a result, the Count must be dismissed.  Defendants have failed to show how their breach of contract claim rises to the level of a CUTPA violation.  They have not bothered to plead any *substantial aggravating* circumstances affecting them, as opposed to third parties, that can underpin a CUTPA claim in Connecticut. Finally, all the various accusations deal with the retention and representation of clients, not entrepreneurial aspects of the practice of law that could conceivably fit within CUTPA's realm. *Haynes v. Yale–New Haven Hospital,* 243 Conn. 17, 34, 699 A.2d 964 (1997) (The most significant question in considering a CUTPA claim against an attorney is whether the allegedly improper conduct is part of the attorney's professional representation of a client or is part of the entrepreneurial aspect of practicing law).  Applying this distinction to the present case, it is clear the Defendants allegations are insufficient to support a CUTPA claim against the Plaintiff law firm. Here, Defendants fail to allege anything more than a contract conflict between two lawyers. This Court should dismiss the CUTPA claim in its entirety.

### 3) Conversion (Count Three)

Defendants did not comply with this Court's Order in so far as they failed to remedy the defects of the Conversion Counterclaim.  Plaintiff incorporates the Original Motion as part of this brief.  "Money can clearly be subject to conversion." *Omar v. Mezvinsky,* 13 Conn.App. 533, 536, 537 A.2d 1039, cert. denied, 208 Conn. 803, 545 A.2d 1101 (1988).  However, "for the plaintiffs'

conversion claim to survive a motion to strike, the plaintiffs must present a theory of how ... the money that the defendants allegedly have retained ... [is] the plaintiffs' property." *Macomber v. Travelers Property & Casualty Corp.,* 261 Conn. 620, 649, 804 A.2d 180 (2002).

In *Macomber,* the court upheld the granting of a motion to strike a claim of conversion as the plaintiffs could not "point to specific, identifiable money to which they had a right, just as they must in order to support a conversion claim regarding any other type of chattel." *Id.,* at 650.  In *Deming v. Nationwide Mutual Ins. Co.,* 279 Conn. 745, 905 A.2d 623 (2006), the dispute was over the payment of certain deferred compensation benefits and commissions after the plaintiffs terminated their employment relationships with the defendants. The plaintiffs' claim of conversion, with respect to these deferred compensation benefits and commissions, failed as the plaintiffs did not allege that they <u>ever possessed</u> the accumulated funds. *Id.,* at 773. See also *Fiume v. Wiremold Co.,* Superior Court, judicial district of Hartford, Docket No. CV 054014882 (September 29, 2006, Tanzer, J.) (42 Conn. L. Rptr. 94) (motion to strike a claim for conversion granted as the plaintiff only alleged that the defendant withheld bonus payments due him under an employment agreement).

Defendants evidently did not read the Original Motion and have now failed, yet again, to make the required allegation that they ever possessed the funds that are the subject of the alleged conversion.  Furthermore, Defendants have failed to point to specific, identifiable money that they believe was converted.

Furthermore, *Macomber* also states that a conversion action is not appropriate in a breach of contract claim.  "A mere obligation to pay money may not be enforced by a conversion action ... and an action in tort is inappropriate where the basis of the suit is a contract, either express or implied." (Citations omitted.) *Macomber* supra. 261 Conn. 620, 649, 804 A.2d 180 (2002). *See Belford*

*Trucking Co. v. Zagar*, 243 So.2d 646, 648 (Fla.App.1970).   Here, Defendants claims are based on

an alleged contractual relationship between the parties.   Therefore, Defendants conversion claim

does not state claim upon which relief can be granted.

### *4)   Statutory Theft C.G.S. § 52-564 (Count Four)*

Defendants "Statutory Theft" claim fails. As the Connecticut Supreme Court explained in

*Deming v. Nationwide Mutual Ins. Co.*, 279 Conn. 745, 771, 905 A.2d 623, 640 (2006):

> "Statutory theft under § 52-564 is synonymous with larceny under General Statutes § 53a-119.... In Macomber, we cited approvingly case law from other jurisdictions setting forth the general rule that, "[a]n action for conversion of funds may not be maintained to satisfy a mere obligation to pay money.... It must be shown that the money claimed, or its equivalent, at all times belonged to the plaintiff and that the defendant converted it to his own use." (Internal quotation marks omitted.) Id., quoting National Union Fire Ins. Co. of Pittsburgh, Pa. v. Wilkins-Lowe & Co., 29 F.3d 337, 340 (7th Cir.1994). Thus, "[t]he requirement that the money be identified as a specific chattel <u>does not permit as a subject of conversion an indebtedness which may be discharged by the payment of money generally</u>.... <u>A mere obligation to pay money may not be enforced by a conversion action ... and an action in tort is inappropriate where the basis of the suit is a contract, either express or implied</u>." (Citations omitted.) Belford Trucking Co. v. Zagar, 243 So.2d 646, 648 (Fla.App.1970). <u>Consistent with this rule, in our case law sustaining a cause of action wherein money was the subject of the conversion or theft, the plaintiffs in those cases at one time had possession of, or legal title to, the money</u>.  (emphasis supplied)

Thus, the Count for Statutory Theft fails for the same reasons as the Conversion Count.

Connecticut law does not permit this cause of action to proceed because the subject of alleged

conversion is indebtedness that may be discharged by the payment of money generally.  A mere

obligation to pay money may not be enforced by an action for theft. Moreover, Defendants have not

pled, and cannot plead, that they ever had possession of any of the moneys to which they now lay

claim. Therefore, Count Four must be dismissed.

### 5) *Quantum Meruit (Count Five)*

A claim for *quantum meruit* is not available to the Defendants.  As stated in the Original

Motion, the *quantum meruit* claim lies where an attorney is discharged by the client before he is able

to perform under the terms of the contract. *See Cole v. Myers*, 128 Conn. 223, 230, 21 A.2d 396

(1941).  Here, Defendants cannot seek damages from Plaintiff under a *quantum meruit* theory.

Defendants do not allege that they were discharged by any client entitling them to recover under

*quantum meruit*.  For a *quantum meruit* theory to be applicable to the Defendants, they would have

to bring actions against the clients for fees lost due to discharge prior to the occurrence of the

contingency.  Defendants' reliance on *quantum meruit* as an attorney and law firm is misplaced.

Therefore, Defendants' *quantum meruit* should be dismissed.

### 6) *Abuse of Process (Count Seven)*

Defendants continue to pleads "Abuse of Process" notwithstanding clear and cogent

explanation in the Original Motion why they cannot recover under that theory. This Court should

dismiss Defendants' entire Count Seven as it fails to state a claim upon which relief can be granted.

Defendants allege that the Plaintiff brought its action "without probable cause and with the specific

intention …  but as a guise to attempt to improperly scare and stop Hussin from asserting her

entitlement in the Horton Class Action, and to bankrupt and cause Hussin financial ruin, and to

generally harass, annoy, embarrass, and cost defendant sums to defend the action, all of which

purposes are improper purposes for issuing process."  Id. ¶ 253.

As the Connecticut Supreme Court has noted:

"An action for abuse of process lies against any person using a legal process against another
in an improper manner or to accomplish a purpose for which it was not designed. *Varga v.
Pareles*, [137 Conn. 663, 667, 81 A.2d 112 (1951) ]; *Schaefer v. O.K. Tool Co.*, 110 Conn.
528, 532–33, 148 A. 330 (1930). Because the tort arises out of the accomplishment of a result

that could not be achieved by the proper and successful use of process, the Restatement Second (1977) of Torts, § 682, emphasizes that the gravamen of the action for abuse of process is the use of a legal process ... against another *primarily* to accomplish a purpose for which it is not designed.... Comment b to § 682 explains that the addition of primarily is meant to exclude liability when the process is used for the purpose for which it is intended, but there is an incidental motive of spite or an ulterior purpose of benefit to the defendant. See also 1 F. Harper, F. James & O. Gray, Torts (2d Ed.1986) § 4.9; R. Mallen & V. Levit, Legal Malpractice (2d Ed.1981) § 61; W. Prosser & W. Keeton, Torts (5th Ed.1984) § 121." (Emphasis in original; internal quotation marks omitted.) *Mozzochi v. Beck,* 204 Conn. 490, 494, 529 A.2d 171 (1987).

*Suffield Development Associates Ltd. Partnership v. National Loan Investors, L.P.,* 260 Conn 766, 772-773 (2002)

Under *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955, this Court must look beyond the labels Defendants use to determine whether the claim is supported by factual allegations. On its face Lemberg's claim in this case is a simple claim for damages based on fees and for Defendants' unauthorized use of records wrongfully taken from Lemberg's computer system by the Defendants. There is nothing particularly alleged in Count Seven of the Counterclaim which would show this action was brought "*primarily* to accomplish a purpose for which it is not designed" and the mere allegations that Hussin thinks the action was spiteful does not convert a vanilla federal damage claim into an abuse of process under state law.  Indeed if Defendants paid what is owed to Plaintiff and the reasonable fees Plaintiff incurred ion trying to collect funds which were escrowed but which have since been comingled in Defendant Hussin's private accounts, this case would be over.

Although Defendants caption Count Seven as "Abuse of Process", it appears to be a claim of vexatious litigation against the Plaintiff.   By statute, a claim of vexatious litigation is one brought without probable cause.  Conn Gen Stat. § 52-568.  Here plaintiff superficially alleges Lemberg's case was brought without probable cause.   Counterclaim ¶ 253.   The Connecticut Supreme Court has explained that "a claim for vexatious litigation requires a plaintiff to allege that the previous

lawsuit was initiated maliciously, without probable cause, and terminated in the plaintiffs favor ... In suits for vexatious litigation, it is recognized to be sound policy to require the plaintiff to allege that prior litigation terminated in his favor.  This requirement serves to discourage unfounded litigation without impairing the presentation of honest but uncertain causes of action to the courts ... The requirement furthermore serves the interest of finality of judicial decisions, by preventing a person who was unsuccessful in the original proceeding from relitigating the same issues in a subsequent action for vexatious litigation." (Citations omitted; internal quotation marks omitted.) *Zeller v. Consolini,* 235 Conn. 417, 424, 667 A.2d 64 (1995); see also *Rioux v. Barry,* 283 Conn. 338, 347, 927 A.2d 304 (2007).  Thus, properly viewed Defendants' Count Seven should be viewed as alleging vexatious suit claim rather than an abuse of process.

No determination has been made as to Lemberg's Complaint and Defendants have certainly not prevailed on Lemberg's claims.  Therefore, Count Seven should be dismissed for failure to state a claim.  Defendants should only be able to bring this claim if and after Defendants can allege they prevailed on Plaintiff's allegations. [4]

Furthermore, under Connecticut law, a party does not abuse the legal process merely by filing suit.  *Doctor's Associates, Inc. v. Weible*, 92 F.3d 108, 114 (2d Cir. 1996).  This is true regardless of the plaintiff's motive.  *Varga v. Pareles,* 137 Conn. 663, 81 A.2d 112, 115 (1951) ("while an ulterior motive often is present, it is not an essential element of the action [for abuse of

---

[4] Although abuse of process claims do not include favorable termination as an essential element, the cause of action is still considered premature until the underlying litigation has been completed. *Larobina v. McDonald,* supra, 274 Conn. at 407–408, 876 A.2d 522. In *Larobina,* our Supreme Court concluded that an abuse of process claim was properly dismissed as premature when the underlying action was still pending. Id., at 408, 876 A.2d 522. In reaching requisite this conclusion, the court stated: "Although we do not suggest that success in the first action would be a prerequisite for an abuse of process claim ... it is apparent that the eventual outcome of that action and the evidence presented by the parties therein would be relevant in litigating an abuse of process claim....  Moreover, allowing the [abuse of process] claim could ... effectively chill the vigorous representation of clients by their attorneys." Id., at 407–408, 876 A.2d 522.

process]").  Rather, liability for abuse of process lies only when the offending party overtly misuses the process once the proceeding has begun.  *See Mozzochi v. Beck,* 204 Conn. 490, 529 A.2d 171, 173 (1987) (abuse of process claimant must "point to specific misconduct intended to cause specific injury outside of the normal contemplation of private litigation"); *Shaeffer v. O.K. Tool Co.,* 110 Conn. 528, 148 A. 330, 332 (1930) (abuse of process occurs "not in the issue of process, but in its abuse"); *Lewis Truck & Trailer, Inc. v. Jandreau,* 11 Conn.App. 168, 526 A.2d 532, 534 (1987) (" 'the gist of the tort [of abuse of process] is not commencing an action or causing process to issue without justification, but misusing, or misapplying [that] process' " (citation omitted)); *see also Lodges 743 & 1746 v. United Aircraft Corp.,* 534 F.2d 422, 465 (2d Cir.1975) ("Abuse of process requires more than simply improper motive. There must also be some action taken to utilize the court's processes for collateral purposes not related to the suit in question ...."), *cert. denied,* 429 U.S. 825, 97 S.Ct. 79, 50 L.Ed.2d 87 (1976); W. Page Keeton, *et al., Prosser and Keeton on the Law of Torts* § 121, at 898 (5th ed.1984) ("a wilful act in the use of the process not proper in the regular conduct of the proceeding" is one of "[t]he essential elements of abuse of process").  In short, no matter what misconduct by the tortfeasor occurs before the commencement of suit, it is not, in itself, an abuse of process because there is not yet process to abuse.  *Doctor's Associates, Inc. v. Weible*, 92 F.3d 108, 114 (2d Cir. 1996)

Defendants' allegation of abuse of process is based solely on Plaintiff's filing of this action.  The mere filing of suit is not an abuse of process. *Id.*  Even taking the Defendants allegations as true, which Plaintiff disputes, that the Plaintiff filed the underlying action with an improper motive, it is well settled that an improper motive does not turn create simple collection and damage action into  an abuse of process without additional allegations.  All of Plaintiff's incorporated

allegations relate to Plaintiff's conduct before the lawsuit was filed, which cannot be allegations of abuse of process because no process had begun to abuse.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court expunge certain portions of the Defendants' Amended Answer and Counterclaim from the public record and strike, portions of the Defendants' Second Amended Answer, Affirmative Defenses and Amended Counterclaims and dismiss certain claims in Defendants' Amended Counterclaim. Specifically, the Plaintiff requests that:

1. The Court to strike paragraphs 91, 92, 93, 94, 96, 97, 98, 99, 111, 112, 113, 123 and 178 of the SAC.

2. The Court to dismiss any and claims related to third parties including those claims that rely on paragraphs 91, 94, 92, 93, 94, 96, 97, 98, 99, 111, 112, 113, 123 and 178., and portions of Defendants prayer for relief;

3. The Court should strike as impertinent Pars. 8-59 and 96-101 of SAC;

4. The Court to dismiss Counts One, Two, Three, Four, Five and Seven of Defendants Counterclaim for failure to  state a claim on which relief can be granted;

5. The Court should dismiss First and Second Affirmative Defenses;

6. Finally, to the extent any stricken material is incorporated in the Answer or Affirmative defenses, the Court should direct that references to those materials be stricken as well;

7.  The Court should award any other appropriate relief as it deems fit in view of its

December 18, 2015 Order.

**THE PLAINTIFF/COUNTERCLAIM DEFENDANT,
LEMBERG LAW, LLC**


By:   /s/ Peter M. Nolin
**PETER M. NOLIN (ct06223)
RYAN W. SCULLY (ct28039)
CARMODY TORRANCE SANDAK, HENNESSEY LLP**
707 Summer Street – 3rd Floor
Stamford, CT 06901-1026
Tel: 203-425-4200
Fax: 203-325-8608
pnolin@carmodylaw.com
rscully@carmodylaw.com

**<u>CERTIFICATION</u>**

I hereby certify that on January 29, 2016, a copy of the foregoing Memorandum in Support of Plaintiff's Rule 12 Motion was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.


By:   /S/ Ryan W. Scully _____
Ryan W. Scully